IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NANCY HOLLINGSHEAD,

        Plaintiff,               No. CIV S-06-0590 GGH

     vs.

MICHAEL J. ASTRUE,[1]           ORDER
Commissioner of
Social Security,

        Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").  For the reasons that follow, plaintiff's Motion for Summary Judgment or Remand is granted in part, the Commissioner's Motion for Summary Judgment is granted in part and denied in part, and this matter is remanded pursuant to Sentence Four of 42 U.S.C. § 405(g), to the ALJ for further findings as directed in this opinion.  The Clerk is directed to enter judgment for plaintiff.

\\\\\

---

[1]  Michael J. Astrue became Commissioner on February 12, 2007.  Accordingly, he should be substituted as defendant in this suit.  Fed. R. Civ. P. 25(d)(1).  No further action need be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

BACKGROUND

Plaintiff, born December 18, 1956, applied for disability benefits on June 13, 2002. (Tr. at 57-59.) Plaintiff alleged she was unable to work since March 24, 2001, due to severe pain in her shoulders, arms and hands, including lack of strength in her right hand, and depression. (Tr. at 63.) In a decision dated April 20, 2005, ALJ Catherine R. Lazuran determined plaintiff was not disabled.[2] The ALJ made the following findings:

1.   The claimant met the non disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through December 31, 2004.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's history of bilateral rotator cuff tears and

_____

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
    Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
    Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
    Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
    Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
    Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.   _____
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

surgeries, history of carpal tunnel syndrome and release, osteoarthritis of the right knee, obesity, depressive disorder and borderline personality traits are considered "severe" based on the requirements in the Regulations, 20 CFR § 404.1520(c).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently (at times using only one arm).  She can stand and walk 6 hours out of an 8-hour day and sit 6 hours out of an 8-hour day.  She can occasionally kneel, crouch and stoop.  She can occasionally reach, handle, feel, grasp, and finger bilaterally.  She can do occasional overhead activities.  She is limited to simple and less than complex tasks.

7.   The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.   The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

9.   The claimant has a "high school education" (20 CFR § 404.1564).

10.  The claimant has skilled work experience and transferable skills or semi-skills.

11.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.  Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform, according to the vocational expert.  Examples of such jobs include work as a gate guard, ticket seller, and information clerk.  There are 50,000 gate guard jobs, 65,000 ticket seller jobs, and 85,000 information clerk jobs in the national economy.

13.  The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of

3

1    this decision (20 CFR § 404.1520(g)).

2  (Tr. at 20-21.)

3  ISSUES PRESENTED

4          Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Provide

5  Clear and Convincing Reasons for Rejecting Plaintiff's Testimony Regarding the Severity of Her

6  Symptoms; B.  Whether the ALJ Gave Specific and Legitimate Reasons for Disregarding the

7  Opinions of the Medical Consultant and Examining Physician; C.  Whether the ALJ Overlooked

8  Significant Relevant Evidence in Determining Plaintiff's Residual Functional Capacity; and D.

9  Whether the ALJ's Vocational Findings Were Not Supported by Substantial Evidence.

10  LEGAL STANDARDS

11          The court reviews the Commissioner's decision to determine whether (1) it is

12  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

13  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

14  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

15  Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

16  accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

17  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

18  (1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

19  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

20  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

21  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

22  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

23  ANALYSIS

24      A.  The ALJ Properly Evaluated Plaintiff's Credibility

25          Plaintiff contends that the ALJ erred in discrediting the severity of her symptoms

26  because they were not supported by objective medical evidence, conflicted with her daily

4

1  activities and her care for her dying mother, and because she gave inconsistent reports about why

2  she left her last job.  Plaintiff also objects to the ALJ's rejection of her need to lie down and her

3  suicide talk.

4          The ALJ determines whether a disability applicant is credible, and the court defers

5  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

6  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

7  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

8  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

9  supported by "a specific, cogent reason for the disbelief").

10          In evaluating whether subjective complaints are credible, the ALJ should first

11  consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

12  F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible

13  solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record

14  contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

15  then considers the nature of the alleged symptoms, including aggravating factors, medication,

16  treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the

17  applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

18  inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

19  and (3) daily activities.[3]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

20  SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

21  and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

22  between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

23  ────────────────

24        [3] Daily activities which consume a substantial part of an applicants day are relevant.
    "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
    activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
25  any way detract from her credibility as to her overall disability.  One does not need to be utterly
    incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
26  (quotation and citation omitted).

119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

In this case, the ALJ gave a complete explanation for finding plaintiff not credible:

> The claimant has a fair to good work history but has been inconsistent in her reports of the reason she left her last job. She testified that she left the job because of problems with her hands but she told an evaluating physician that she left after finding out the people she worked with were 'dysfunctional' (Exhibit 10F-2). Despite her complaints of pain, the claimant has been able to lead an active lifestyle. She cared for her mother until her death in October 2003. She testified that she did this from March 2003 to October 2003. Her mother had leukemia. In addition to caring for her mother, the claimant's daily activities include vacuuming, shopping, and using a treadmill. She testified that she used the treadmill until April 2004. The claimant has traveled to Mendocino and Stinson Beach. She has been house boating at Lake Shasta. She does laundry, drives, and reads. The claimant's daily activities and travels are not consistent with her allegations that she can sit for only 1 hour and stand for only 1 hour in an 8 hour day. While she may lie down during the day, there is no evidence that this is a medical necessity.

(Id. at 16.) Additionally, despite plaintiff's talk of suicide, the ALJ noted that she denied any intent to commit suicide in her visits with treating sources. In fact, she told one physician that if she were hospitalized, "she would just play a game and misrepresent her feelings to gain rapid release." (Id. at 16.) Finally, the ALJ noted that treating and evaluating physicians alike have found that she is not as limited as she alleged in her testimony. (Id.)

Plaintiff first asserts she has osteoarthritis in her right knee, degenerative joint disease, and objective evidence of locking of the knees, small joint effusion in the right knee per MRI, mild medial compartment narrowing and patellar tilt in the right knee per x-ray, and

1  therefore the ALJ's finding that she can stand for six to eight hours is not supported by the

2  record.  The ALJ's finding in this regard permitted plaintiff to stand for six hours, not six to eight

3  hours as plaintiff asserts.  This finding is consistent with findings by almost all of the cited

4  physicians, including Drs. Wheeler, Specht, and both state agency reviewers.  (Id. at 182, 216,

5  185, 254.)  Only Dr. Kelly required plaintiff to take a break every 45 minutes during the six hours

6  that she was able to stand and walk.  (Id. at 214.)

7          Next, plaintiff objects to the ALJ's finding that her claimed need to lie down

8  during the day is not medically supported.  Plaintiff asserts that her medications, chronic pain,

9  obesity and right knee osteoarthritis sufficiently explain her need to lie down during the day.

10         The majority of physicians found plaintiff could do a modified range of light

11  work, despite these asserted limitations.  Dr. Wheeler found that plaintiff, despite her obesity,

12  medications, intermittent right knee pain, and complaints of pain, could stand and walk at least

13  six hours, and sit without restrictions during the eight hours.  She could lift and carry 20 pounds

14  occasionally and 10 pounds frequently, but only with her left arm as her right shoulder was

15  continuing to recover from recent surgery.  Dr. Wheeler predicted that plaintiff would be able to

16  lift weights with her right hand as it got stronger.  Plaintiff could also bend, stoop, and crouch

17  frequently.  There were no manipulative limitations with her left hand, but she was severely

18  limited with her right hand at the present time.  This neurologist predicted that plaintiff might

19  later be able to perform these activities as she recovered.  (Id. at 183-84.)  She noted that plaintiff

20  did not need an assistive device.  (Id. at 183.)  Further, her exam revealed knee extension was

21  zero degrees and flexion was 0-130 degrees bilaterally, which is normal.  (Id. at 181.)

22         Dr. Specht, plaintiff's treating physician at Kaiser, was very familiar with

23  plaintiff's above noted problems.  She nevertheless found that plaintiff could work, lifting 20

24  pounds occasionally and 10 pounds frequently, standing, walking, or sitting for six hours, with

25  no need to alternate standing and sitting.  (Id. at 216-17.)  Plaintiff could frequently balance,

26  stoop and kneel, occasionally climb, crouch and crawl.  Reaching was permitted with the left arm

7

1  only.  There was no restriction in handling, fingering, and feeling.  (Id. at 217.)  She stated that

2  plaintiff did not use an assistive device.  (Id. at 216.)  Prognosis was guarded.  (Id. at 217.)

3          Dr. Kelly's report was mostly consistent with the other residual functional

4  capacity assessments.  She also considered plaintiff's other ailments for which she claims a need

5  to lie down.  This consultant, who specializes in physical medicine and rehabilitation, diagnosed

6  plaintiff with obesity, right knee osteoarthritis, status post right rotator cuff repair with mild

7  residual range of motion deficits and mild residual pain, reported history of left rotator cuff

8  tendinitis with surgery pending and range of motion deficits related to pain, mild bilateral carpal

9  tunnel syndrome, more on the right side, and depression.  (Id. at 213.)  She was also aware of

10  plaintiff's pain and medications.  With these problems in mind, she found plaintiff could stand

11  and walk for six hours with breaks every 45 minutes, sit without restriction, lift and carry 20

12  pounds frequently and 50 pounds occasionally.  She does not use an assistive device, but one

13  would aid for long distance or uneven terrain.  Plaintiff should avoid excessive flexion and

14  extension of the knees, including kneeling, crouching, and stooping, and perform these activities

15  only occasionally.  She should avoid frequent reaching, handling, feeling, grasping, and

16  fingering, and overhead activities, but should do them only occasionally.  (Id. at 214.)

17          The State Agency physicians reviewed the file approximately one year apart, on

18  February 19, 2003 and February 2, 2004.  They both found that plaintiff could lift 20 pounds

19  occasionally and ten pounds frequently.  She could stand, walk, or sit for six hours.  (Id. at 185,

20  254.)  The more recent report stated that plaintiff could do unlimited pushing and pulling.  This

21  report was based on plaintiff's recovery from right shoulder acromioplasty, distal clavicle

22  resection and rotator cuff repair which occurred on November 11, 2002. (Id. at 254.)  Plaintiff

23  had not yet undergone left shoulder rotator cuff repair which she underwent on March 2, 2004.

24  (Id. at 268-270.)  The remainder of the most recent DDS evaluation found that plaintiff could

25  frequently balance and stoop, and occasionally climb, kneel, crouch and crawl.  (Id. at 255.)

26  Reaching was limited but handling, fingering and feeling were unlimited.  (Id. at 256.)

All of these physicians considered plaintiff's obesity, right knee osteoarthritis, chronic pain, and fatigue from medications, and found she was able to work without needing to lie down during the day.  Furthermore, plaintiff testified that her pain medications did reduce her pain.  (Tr. at 371.)

Plaintiff also objects to the ALJ's rejection of her history of talking about suicide. She points to various records where she reported suicidal ideation.  On this subject, the ALJ stated:

> The undersigned has closely evaluated her recent psychiatric records in this regard.  She has not required hospitalization and has denied intent to commit suicide to treating sources (Exhibits 16F-5, 17F-3).  She told a doctor that if she were hospitalized, 'she would just play a game and misrepresent her feelings to gain rapid release.'  The claimant's admission that she would not be honest with treating sources damages her credibility.  Treating and evaluating physicians have opined that the claimant is not limited to the extent she alleged in her testimony.

(Id. at 16.)

Plaintiff has reported suicidal thoughts, but stated that she would not follow through due to the potential impact on her daughter.  (Id. at 284.)  On December 1, 2003, plaintiff told the medical source that if she tried to lock her up for these thoughts, plaintiff would just play a game and misrepresent her feelings in order to get quick release.  (Id.)  The ALJ properly considered this statement in judging her credibility, and questioning how honest plaintiff was being in other statements to medical practitioners.  Although one could draw a different inference from plaintiff's statements regarding suicide, the ALJ was not forced to choose the one that favored plaintiff.  He also considered her statement that she left her last job because the people she worked for were dysfunctional, while elsewhere testifying that she left this job due to hand, arm and shoulder problems.[4]  (Id. at 210.)

---

[4] Plaintiff asserts that the discrepancy is explained by her diagnosed borderline personality disorder.  (Tr. at 338.)  Plaintiff was diagnosed with this disorder in May, 2005, but made the inconsistent statement on January 17, 2004.  (Id. at 210.)  In any event, these statements

9

1         There are other inconsistencies in the record.  Plaintiff reported to one practitioner

2    that she lives with and cares for her mother even though there is nothing medically wrong with

3    her.  Plaintiff stated that she had cared for her mother for many years because no one else would

4    do it and because her mother is lazy.[5]  (Id. at 298.)  Elsewhere, plaintiff testified that she cared

5    for her mother, who had leukemia, until she died in October, 2003.  (Id. at 383.)  Plaintiff also

6    reported being depressed after her mother's death.  (Id. at 282.)  It does appear that plaintiff was

7    more depressed after her mother died, and that her medication was increased at that time.  (Id. at

8    282, 285.)  Plaintiff did report nonetheless that the medication helped with anxiety, both during

9    this time of increased stress, and at other times.  (Id. at 285, 288, 289.)

10        Most recently, however, on January 27, 2005, the mental health intake at Kaiser

11   noted that plaintiff was a low risk of suicide due to absence of intent and responsiveness to this

12   session, hope for change, and statements that she would not act on these thoughts.  At this time it

13   was also noted that plaintiff denied manipulative behavior.  (Id. at 337.)   Additionally, it was

14   noted elsewhere in various treating records that plaintiff was not suicidal.  (Id. at 295, 296, 297.)

15        It was the ALJ's prerogative to discount plaintiff's reports of suicide attempts and

16   instead rely on records of medication that appeared to be helping plaintiff.[6]  The ALJ may

17   consider prior inconsistent statements in his credibility analysis.  Smolen, 80 F.3d at 1284.

18   Moreover, the ALJ is free to rely on whatever evidence he chooses, even though reliance on

19   \\\\\

20   \\\\\

21

22   are just a few of many facts relied on by the ALJ in making his decision.

23      [5] Plaintiff points to her testimony that her mother had an assistant and was in the hospital

24   most of the time.  Plaintiff did not bathe, lift or dress her mother.  (Tr. at 383-84.)  This
     testimony still does not explain plaintiff's statement that she cared for her mother "for many

25   years."  (Id. at 298.)

26      [6] Plaintiff's reference to the transcript in regard to a suicide attempt in 2002, actually
     contains records relating to a biopsy of a lesion in her forehead.  (Tr. at 299-302.)

1  other evidence would have caused him to reach the opposite conclusion.[7]  <u>Fair v. Bowen</u>, 885

2  F.2d 597, 604 (9th Cir. 1989).

3        In regard to plaintiff's activities, the ALJ found that plaintiff is able to vacuum,

4  shop, use a treadmill, do laundry, drive, read, and cared for her mother before she died, based on

5  the record and plaintiff's own testimony.  (Tr. at 16, 380-83.)  The ALJ also took note of

6  plaintiff's travels to Mendocino, Stinson Beach, and a houseboat on Lake Shasta, all within

7  months or the last few years before the hearing.  (<u>Id.</u>, 381, 289.)  In fact, plaintiff testified that she

8  had been to Costco two weeks before the hearing.  (<u>Id.</u> at 379.)  She does carry the groceries

9  herself, but only buys what will fit in one bag.  (<u>Id.</u>)  She also testified that she takes walks about

10 three times a month.  (<u>Id.</u> at 380.)  She used a treadmill until April, 2003.  She was playing cards

11 with friends every Saturday night, but had not done so since two months before the November,

12 2004 hearing.  (<u>Id.</u>)  On January 18, 2003, plaintiff informed Dr. Wheeler that she reads and does

13 some housecleaning, and walks two to three miles a day on a treadmill.  (Tr. at 179-80.)  Plaintiff

14 reported to Dr. Kelly on January 17, 2004, that she can walk at least 30 minutes to an hour before

15 being limited by pain, can sit without limit, although she feels stiff on getting up, and can stand at

16 least 20 to 30 minutes in one place.  (Tr. at 210.)

17       Plaintiff claims that the ALJ misrepresented the record, and points to her

18 testimony that she cannot get out of bed due to the pain, must rest frequently, can only wash two

19 dishes at a time, and can no longer read due to hand pain.  (Tr. at 387-91.)  The court has checked

20 the record, and finds that the ALJ did not misrepresent it.  Substantial evidence supports his

21 findings, which are based not only on plaintiff's testimony, but her reports to various

22 practitioners.

23 \\\\\

24 \\\\\

25

26    [7]  Similarly, the ALJ was free to rely on medical evidence of plaintiff's mental health rather than her testimony.

1       B.      <u>The ALJ Property Evaluated The Opinions of SSA Physician Bradus and</u>

2 <u>Plaintiff's Treating Physician Specht</u>

3       Plaintiff contends that the ALJ erred in ignoring certain aspects of the SSA

4 doctor's report, and Dr. Specht's report, both of which were given "significant weight" by the

5 ALJ.

6       The weight given to medical opinions depends in part on whether they are

7 proffered by treating, examining, or non-examining professionals. <u>Holohan v. Massanari</u>, 246

8 F.3d 1195, 1201 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).[8]  Ordinarily,

9 more weight is given to the opinion of a treating professional, who has a greater opportunity to

10 know and observe the patient as an individual. <u>Id</u>.; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th

11 Cir. 1996).

12       To evaluate whether an ALJ properly rejected a medical opinion, in addition to

13 considering its source, the court considers whether (1) contradictory opinions are in the record;

14 and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

15 a treating or examining medical professional only for *"clear and convincing"* reasons. <u>Lester</u> ,

16 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may

17 be rejected for *"specific and legitimate"* reasons. <u>Lester</u>, 81 F.3d at 830.  While a treating

18 professional's opinion generally is accorded superior weight, if it is contradicted by a supported

19 examining professional's opinion (supported by different independent clinical findings), the ALJ

20 may resolve the conflict. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

21 <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

22

23     [8]  The regulations differentiate between opinions from "acceptable medical sources" and
"other sources."  <u>See</u> 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
24 psychologists are considered "acceptable medical sources," and social workers are considered
"other sources."  <u>Id</u>.  Medical opinions from "acceptable medical sources," have the same status
25 when assessing weight. <u>See</u> 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26 accordingly are given less weight than opinions from "acceptable medical sources."

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[9] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

Two SSA physicians examined plaintiff's file.  Plaintiff objects to the ALJ's treatment of the earlier report, dated February 19, 2003, in which Dr. Bradus found plaintiff could not use her right upper extremity in pushing and pulling, and could only use the right upper extremity in reaching, handling, and fingering one third of the time.  There was no limitation in use of the left upper extremity.  (Tr. at 185, 187.)  Plaintiff argues that these limitations were supported by examining consultant Dr. Wheeler.

In order to analyze this issue, the chronology of plaintiff's right shoulder must be understood.  Plaintiff underwent rotator cuff surgery on her right shoulder on November 11, 2002.  Dr. Wheeler examined plaintiff and completed a consultative evaluation on January 18, 2003.  At that time, he concluded that due to plaintiff's recent surgery, she could not lift any weight with her right hand, and was severely limited in manipulating her right hand.  He emphasized that as plaintiff recovered she would probably be able to perform these activities with her right hand, i.e., that was the point and hope of the surgery.  (Tr. at 183.)  Shortly thereafter, the first SSA examiner evaluated plaintiff's file on February 19, 2003.  This physician, Dr. Bradus, found that plaintiff had no use of her right upper extremity in pushing or pulling, and only one third use of this extremity in manipulative activities.  (Tr. at 185, 187.)  Dr. Specht, plaintiff's treating physician, evaluated plaintiff on January 21, 2004, nearly a year later.  At that

---

[9]  The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1    time, plaintiff could lift less than ten pounds frequently.  (Id. at 216.)  A short time later, a second

2    SSA examiner, Dr. Jaituni, found on February 2, 2004, that plaintiff was not limited in pushing

3    or pulling, and was only limited in one manipulative motion, which was reaching in all

4    directions, with her right extremity only.  (Id. at 256.)

5            The ALJ gave significant weight to all four of these physicians.  He did not adopt

6    the more restrictive limitations of Drs. Bradus and Wheeler because they evaluated plaintiff

7    within two to three months after her right rotator cuff surgery and plaintiff was not fully

8    recovered at that time.  (Tr. at 17.)  The later opinions of Drs. Specht and SSA examiner Jaituni

9    more accurately reflect plaintiff's condition following a sufficient period of time after plaintiff's

10   recovery from the surgery.

11           In regard to plaintiff's claim that the ALJ relied on Dr. Specht yet found plaintiff

12   could frequently lift ten pounds while this physician limited plaintiff to lifting less than ten

13   pounds, the court fails to find error in a difference of one pound.  Furthermore, the ALJ also

14   relied on the opinions of Drs. Wheeler, Kelly, and the SSA examiners in finding that plaintiff

15   could frequently lift ten pounds.  (Tr. at 17, 18, 183, 214, 254.)  As the ALJ did not reject the

16   opinion of Dr. Specht, he was not required to articulate reasons to explain his decision.  "It is not

17   necessary to agree with everything an expert witness says in order to hold that his testimony

18   contains 'substantial evidence.'" Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989), *citing*

19   Russell v. Bowen, 856 F.2d 81, 83 (9th Cir.1988) (citation omitted).

20           C.  Whether The ALJ Properly Evaluated Plaintiff's Residual Functional Capacity

21           Plaintiff contends that the ALJ erred in failing to account for the side effects of

22   prescribed medications in his RFC finding, as well as plaintiff's obesity, which causes back pain.

23           Plaintiff has listed all her medications, and their side effects; however, as

24   defendant points out, plaintiff did not take all of these medications at the same time.  For

25   example, because Ativan caused too much sedation, Xanax was prescribed to replace it.  Plaintiff

26   only took Vicodin for a couple of weeks or months because it caused sleeplessness.  (Tr. at 370.)

14

1   The ALJ noted that Paxil improved plaintiff's mood.  (Tr. at 15, 17.)

2            Allegations of side effects from medication must be specific and clinically

3   supported.  Miller v. Heckler, 770 F.2d 845 (9th Cir. 1985).  Plaintiff testified that at the time of

4   the hearing, she was taking only Elavil, Paxil, and Relafen.  When asked if there were side

5   effects to any of her medications, she responded only that she had dry mouth.  (Tr. at 371.)  She

6   added that the medicines reduced her pain.  (Id.)  Plaintiff's brief does not point to specific side

7   effects experienced by her, or to any part of the medical record in support, but states only that she

8   has to lie down for about two hours after taking her medications.  The ALJ did not err in failing

9   to consider side effects of medications in regard to plaintiff's residual functional capacity.

10           In regard to obesity, plaintiff has been diagnosed with this impairment.  (Tr. at

11  213.)  Most of the physicians reviewing plaintiff's functional capacity have also noted her

12  obesity.  (Tr. at 181, 270, 235, 253.)  The ALJ found it to be a severe impairment.  (Id. at 14.)

13           In Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005), consideration of plaintiff's

14  obesity at step three was analyzed in light of Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003).  The

15  Celaya factors are whether, despite plaintiff's failure to specifically raise obesity, it was raised as

16  a disabling factor in plaintiff's report of symptoms, whether it was clear from the record that the

17  obesity was close to the listing criterion, and could exacerbate the other alleged impairments, and

18  whether the ALJ should have been on notice of the need to develop the record on obesity due to

19  plaintiff's pro se status, in light of his observation of plaintiff and other information in the record.

20  Id. at 1182.

21           In this case, the ALJ failed to evaluate plaintiff's obesity in conjunction with her

22  residual functional capacity; however, this failure was harmless as all physicians evaluating her

23  did consider her obesity in determining her functional capacity.

24           Plaintiff's alleged back pain as a result of her obesity was not addressed as it was

25  not raised as a problem until the hearing.  The ALJ asked plaintiff what was wrong with her back

26  and plaintiff responded that she did not know.  She then asked whether plaintiff had had any

1    treatment for her back, and plaintiff responded that she had not.  (Tr. at 367.)  Although the ALJ

2    has the burden to develop the record, plaintiff has the burden to bring forward evidence of an

3    impairment.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.

4                    D.  Whether the Vocational Findings Were Supported by Substantial Evidence

5                    Plaintiff raises numerous problems with the ALJ's hypothetical to the expert, and

6    with the expert's response.

7                    Hypothetical questions posed to a vocational expert must include all the

8    substantial, supported physical and mental functional limitations of the particular claimant.

9    Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

10   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

11   expert's testimony as to available jobs in the national economy has no evidentiary value.

12   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

13   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

14   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

15   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

16   other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

17   based on alternate interpretations of the evidence, substantial evidence must support the

18   hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

19   849 F.2d 418, 422 (9th Cir. 1988).[10]

20                   The hypothetical to the expert upon which the ALJ based his decision was that

21   plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, stand, walk and sit six

22   hours, occasionally climb, crouch, crawl, kneel, stoop, reach, handle, feel, grasp, and finger

23   bilaterally, and do occasional overhead activities.  (Tr. at 394-95.)  The vocational expert

24

25        [10]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
     hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d
26   747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial
     evidence or reject them if they are not.  Id. at 756-757.

1  responded that plaintiff could not do her past work but could work as a gate guard or ticket seller,

2  both of which are light work, or information clerk, which is sedentary work.  (Tr. at 395-96.)

3           Plaintiff first asserts that the ALJ failed to include in the hypothetical to the expert

4  plaintiff's limitation of mild difficulties in maintaining social functioning.  Plaintiff contends that

5  since the ALJ found plaintiff's mental illness to be a severe impairment, by definition it is more

6  than minimal and would affect her social functioning.  All three jobs require extensive social

7  functioning, according to plaintiff.  The ALJ did not make a finding that plaintiff had mild

8  difficulties in maintaining social functioning.  The ALJ did find plaintiff's depressive disorder

9  and borderline personality features to be severe impairments.  (Tr. at 15.)  As a result of these

10 impairments, she found that plaintiff was limited to simple and less than complex tasks.  (Id. at

11 18.)  The ALJ did not include any of these resulting limitations in the hypothetical, however.

12          The fact that the ALJ found plaintiff to have severe mental impairments at step

13 two does not equate to a finding that plaintiff is somehow limited at step five.  "The step two and

14 step five determinations require different levels of severity of limitations such that the

15 satisfaction of the requirements at step two does not automatically lead to the conclusion that the

16 claimant has satisfied the requirements at step five."  Hoopai v. Astrue, ___ F.3d ___, 2007 WL

17 2410178, *3 (9th Cir. August 27, 2007).  Hoopai also involved severe impairments of depression

18 and back pain.  Plaintiff had argued that since the depression was found to be severe at step two,

19 it must automatically be a significant non-exertional limitation at step five such that vocational

20 testimony was required.  The court responded that at step five, vocational testimony is only

21 required where non-exertional limitation is "sufficiently severe" to limit a range of work.  Id.,

22 citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988).  Since a step two finding of

23 severity is only a threshold determination of whether someone can do his or her past work, a

24 finding at this step merely raises a prima facie case of a disability.  Id.  In contrast, a step five

25 determination presumes a step two threshold finding, but requires much more in terms of

26 significance.  The court reasoned:

1
2        Clearly, the severity of the limitations at step five that would
    require use of a vocational expert must be greater than the severity
    of impairments determined at step two, otherwise the two steps
3   would collapse and a vocational expert would be required in every
    case in which a step-two determination of severity is made.  This
4   would defeat the purpose of the grids because a claimant could not
    reach the step five determination without making out a prima facie
    case of a severe disability at step two.
5

6   Id. at *4, *citing* Heckler v. Campbell, 461 U.S. 458, 461 (1983).  After reviewing the evidence,

7   the court determined that vocational testimony was not required because the psychiatrists opined

8   that plaintiff's depression was not sufficiently severe to affect his ability to work beyond the

9   exertional limitations.  Id.

10        By implication, the rule of Hoopai applies to this case such that plaintiff's step

11   two finding of depressive disorder and borderline personality features does not automatically

12   require specific limitations in a hypothetical.  Dr. Skille, although diagnosing plaintiff with

13   adjustment disorder with depressed mood, found that she could work and interact effectively

14   with co-workers and supervisors.  (Tr. at 194.)  He did not address whether plaintiff could do

15   jobs involving much interaction with the public.  All three jobs listed by the vocational expert

16   require a high level of social functioning.  See DICOT 237.367-022 (information clerk), 372.667-

17   030 (gate guard), and 211.467-030 (ticket seller).[11]  Because the ALJ did not find that plaintiff

18   had mild difficulties in maintaining social functioning, and such a limitation is not supported by

19   the evidence, the ALJ was not required to include it in her hypothetical.

20   \\\\\

21

22       [11]   The United States Dept. of Labor, Employment & Training Admin., Dictionary of
     Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining
23   the skill level of a claimant's past work, and in evaluating whether the claimant is able to
     perform other work in the national economy."  Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir.
24   1990).  The DOT classifies jobs by their exertional and skill requirements.  It is used by the SSA
     to classify jobs as skilled, unskilled, or semiskilled.  (Id.)  Each job is assigned a number
25   reflecting how long it generally takes to learn the job, termed "specific vocational preparation"
     ("SVP") time.  (Id.)  The DOT is a primary source of reliable job information for the
26   Commissioner.  20 C.F.R. § 404.1566(d)(1).

1    Moreover, the physicians/psychiatrists that saw plaintiff described her depression

2 as "situational," and relating to her shoulder pain.  (Tr. 194, 291, 292).  This is hardly the stuff of

3 unremitting and unable to be alleviated depression expected to last for twelve months or longer.

4 It is reasonable to expect that once her shoulder pain resolved, so too would a good deal of her

5 depression.  At the very least, whatever depression remained would be good candidate for

6 medical/prescription help.

7    The ALJ's limitation to simple and less than complex tasks was assessed due to

8 plaintiff's depression.  (Tr. at 18, 20.)  This limitation has nothing to do with social functioning

9 but rather the degree of sophistication of the work.  The ALJ did not include this limitation in the

10 hypothetical to the vocational expert, however.

11    Both parties fail to mention reasoning level in their analysis but focus on the

12 specific vocational preparation ("SVP") levels; however, the SVP levels should not be confused

13 with reasoning levels as these are two separate vocational considerations.  SVP levels do not

14 address whether a job involves only simple or less than complex tasks.  Meissl v. Barnhart, 403

15 F. Supp. 2d 981, 983 (C.D. Cal. 2005).

16    Here, the limitation to simple and less than complex tasks must be reconciled with

17 the various reasoning levels of the jobs assigned by the vocational expert.  Rather than adhere to

18 a strict construction of what this limitation equates to in terms of reasoning level, this court

19 prefers to follow the well developed reasoning of the Central District in Meissl.  There, the

20 plaintiff was found to be limited to "simple tasks performed at a routine or repetitive pace."  Id.

21 at 982.  The court explained that although the Social Security Regulations contained only two

22 categories of abilities in regard to understanding and remembering instructions, either "short and

23 simple" and "detailed" or "complex,' the DOT had many more gradations for measuring this

24 ability, and there were six gradations altogether.  Id. at 984.  For example, level 2 requires

25 application of "commonsense understanding to carry out detailed but uninvolved written or oral

26 instructions.  Deal with problems involving a few concrete variables in or from standardized

situations."  DICOT, App. C.  The court continued:

> To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail."  Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Meissl, 403 F. Supp.2d at 984.

Furthermore, the use of the term "uninvolved" along with the term "detailed" in the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term.  Id.  The court found that the plaintiff's RFC must be compared with the DOT's reasoning scale.  A reasoning level of one requires slightly less than simple tasks that are in some sense repetitive.  For example, they include the job of counting cows as they come off a truck.  A reasoning level of two would encompass an RFC of being able to do "simple and routine work tasks."  Id.  Taking Meissl to the next level would lead to the conclusion that a reasoning level of three would therefore include the ability to do more than simple and routine work tasks, such as the "simple and less than complex tasks" which have been assigned to plaintiff.

The job of information clerk requires a reasoning level of 4, which is described as follows:

> Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. Examples of rational systems are: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.

DICOT 237.367-022.  The jobs of gate guard and ticket seller contain a reasoning level of 3, and require application of "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations."  DICOT 372.667-030; 211.467-030.

1   Information clerk, with its reasoning level of 4, and SVP level of 4, requiring

2 three to six months of training, is not unskilled work.  See 20 C.F.R. § 404.1568(a).  It requires

3 more than an ability to do simple and less than complex tasks.  The ALJ erred in finding that

4 plaintiff could do this job.

5   The gate guard job has an SVP level of 3 and therefore requires one to three

6 months of training.[12]  Thus, it is not unskilled work.  Plaintiff argues that some of the vocational

7 expert's stated transferable skills are not skills at all, or are otherwise not transferable.[13]  The

8 vocational expert testified that of plaintiff's past work as housecleaner, office manager, telephone

9 answering service operator, cable tv installer, maintenance worker, and cleaner helper, plaintiff

10 had the following transferable skills: "telephone skills, record keeping, bookkeeping, public

11 contact, customer service and computer data entry."  (Tr. at 394.)  These activities properly

12 qualify as skills.  See, e.g., Ingle v. Heckler, 763 F.2d 169, 170 (4th Cir.1985) (abilities identified

13 by vocational expert such as record keeping were transferable skills); Wallace v. Secretary of

14 Health and Human Services, 586 F. Supp. 395 (D.N.J.1984) (ability to pay attention, concentrate,

15 perceive details, do a number of things at one time, manual dexterity and good vision are not

16 skills); Robertson v. Heckler, 603 F. Supp. 147, 148-50 (N.D. Cal. 1985) (discussing distinctions

17 between aptitudes and skills).

18

---

19  [12]  Plaintiff contends that the vocational testimony that the gate guard job was an SVP of
20 2 was in conflict with the DOT which assigns an SVP level of 3 to this job.  (Tr. at 395.)  DICOT
 372.667-030.  Therefore, plaintiff contends, SSR 00-04p mandates remand to resolve the
 conflict.  Where a conflict exists between the DOT and vocational testimony, the ALJ is required
21 to obtain an explanation for the conflict.  Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir.
 2007).  Here, it appears only that the vocational expert was mistaken.  The court will rely on the
22 DOT for the SVP level.  Therefore, any error by the ALJ in failing to question the vocational
 expert about potential conflict between her testimony and the DOT was harmless as no conflict
23 appears to exist.  Massachi, 486 F.3d at 1154 n. 19 (failure harmless if no conflict between
 vocational opinion and DOT or if VE provides sufficient support for conclusion that justifies any
24 potential conflicts).

25  [13]  Plaintiff makes this argument in regard to the job of information clerk also, but since
 the court has found that plaintiff can not do that job, this argument will not be addressed in
26 regard to that work.

The gate guard job description involves the following tasks:

Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone.  Issues passes at own discretion or on instructions from superiors.  Directs visitors and truckers to various parts of grounds or buildings.  Inspects outgoing traffic to prevent unauthorized removal of company property or products.  May record number of trucks or other carriers entering and leaving.  May perform maintenance duties, such as mowing lawns and sweeping gate areas.  May require permits from employees for tools or materials taken from premises.  May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022].  May answer telephone and transfer calls when switchboard is closed.  When stationed at entrance to restricted area, such as explosives shed or research laboratory, may be designated Controlled-Area Checker (any industry).

DICOT 372.667-030.

The court fails to find why at least some of the stated transferable skills are not transferable to this job.  By its very definition, it requires the skills of answering the telephone and transferring calls, record keeping (recording number of carriers entering and leaving), and public contact.  Plaintiff most likely could do this job that required only one to three months of training even if no skills were transferable.

Assuming arguendo that plaintiff could not do the job of gate guard, she clearly can do the job of ticket taker.  The ticket seller job, at a reasoning level of 3, contains an SVP level of 2, and requires up to one month of training.  It is therefore unskilled in nature.  Other jobs which have a reasoning level of 3 and are unskilled have been found to qualify for work where the plaintiff is unable to perform complex tasks.  Renfrow v. Astrue, ___ F.3d ___, 2007 WL 2296409, *3(8th Cir. August 13, 2007); Hillier v. Soc. Sec. Admin., 486 F.3d 359, 364 (8th Cir. 2007) (finding plaintiff's limitation to following simple, concrete instructions permitted her to work as cashier even though classified as requiring level 3 reasoning and was not inconsistent with DOT).  Since plaintiff could do the job of ticket seller and the vocational expert testified that there are 65,000 such jobs in the national economy, it exists in significant numbers, and any

failure by the ALJ to rectify an inconsistency between the vocational testimony and the DOT was harmless.  An error which has no effect on the ultimate decision is harmless.  <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1121 (9th Cir. 1990).

Plaintiff's claim that the ticket seller job requires constant handling and fingering[14] and is therefore in conflict with the expert's testimony that plaintiff can do this job despite the ALJ's posed limitation of only occasional handling and fingering, was explained by the expert who testified that admittedly this job requires "constant reaching, handling, feeling, but it can be performed one-handed ... ."  (Tr. at 396.)  Pursuant to <u>Massachi</u>, this justification renders any error harmless.  <u>See</u> <u>supra</u> n. 12.

E.  <u>Closed Period of Disability</u>

Plaintiff claims that the ALJ failed to consider a closed period of disability due to her shoulder injury and carpal tunnel syndrome, beginning with her onset date of March 24, 2001 for her shoulder.  Her MRI of October 21, 2001 showed extensive shoulder injury, and she did not undergo surgery until November 11, 2002.  Plaintiff claims her carpal tunnel syndrome was documented beginning in February, 2001, and she underwent carpal tunnel release surgery in July, 2001.

A "closed period" refers to a claimant's disability which started and stopped prior to the ALJ's decision.  In a closed period of disability, starting and ending dates for disability benefits are determined in the same decision.  <u>See</u>, <u>eg.</u>, <u>Pickett v. Bowen</u>, 833 F.2d 288, 289 n.1, 291 (11 Cir. 1987).  In Title II cases, an insured person is entitled to DIB if he or she has filed an application and been under a disability for five consecutive calendar months.  42 U.S.C. § 423(a)(1)(D)(I), (c)(2).

\\\\\

---

[14]  Plaintiff mistakenly states that the ticket seller job requires constant handling and feeling, but feeling is not present in that job which requires constant handling and fingering. DICOT 211.467-030.

1        Defendant has not responded to this issue raised by plaintiff.  It is not clear from

2   the record whether plaintiff was disabled during these time periods.  Therefore, the case will be

3   remanded for determination of a closed period of disability.  The ALJ may further develop the

4   record for this time period as necessary.

5   <u>CONCLUSION</u>

6        Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment or

7   Remand is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the

8   Commissioner's Cross Motion for Summary Judgment is GRANTED in part and DENIED in

9   part, and this matter is remanded for further findings in accordance with this order.  The Clerk is

10  directed to enter Judgment for plaintiff.

11  DATED: 9/12/07                                    /s/ Gregory G. Hollows

12                                                     _____
                                                       GREGORY G. HOLLOWS
                                                       U.S. MAGISTRATE JUDGE
13  GGH/076
    Hollingshead0590.ss.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

24